THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DEBORAH M. LUMBARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-CV-11124-PBS |
| | ) | |
| THE PRUDENTIAL INSURANCE | ) | |
| COMPANY OF AMERICA and | ) | |
| STATE STREET BANK AND TRUST | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff Deborah M. Lumbard submits this memorandum in support of her motion for summary judgment.[1]

## INTRODUCTION

This is an action brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, for reinstatement of long-term disability ("LTD") benefits in which both parties are seeking summary judgment. While a motion for summary judgment is the procedural vehicle by which the denial of a benefits claim is tested under ERISA, summary judgment is a misnomer in an ERISA context because "the district court sits more as an appellate tribunal than as a trial court." *Leahy v. Raytheon Co.,* 315 F.3d 11, 18 (1st Cir. 2002). Hence, when the parties in an ERISA case submit cross motions for judgment based on the administrative record, the case is deemed to be submitted as stated. *Garcia-Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 643- 44 (1st Cir. 2000).[2]

---

[1] This memorandum exceeds the 20-page limit established by Local Rule 7.1(B)(4), because at the Scheduling Conference on August 16, 2005 the parties requested leave to file a 40 page memorandum and the Court stated that any memorandum was limited to 30 pages.

[2] Prudential has filed with the Court what it claims to be the administrative record. As explained later in this memorandum, Mrs. Lumbard maintains that certain documents should not be considered part of the administrative record. Nevertheless, to avoid

Mrs. Lumbard is a former employee of State Street Bank and Trust Company ("State Street"). She ceased working for State Street in April 2000 because of a painful and disabling condition with her knees. After exhausting her short term disability benefits, Mrs. Lumbard was paid LTD benefits for two years under an employee benefit plan known as the State Street Bank and Trust Company Weekly Disability Coverage and Long Term Disability Coverage for All Employees ("Plan"). Prudential Insurance Company of America ("Prudential") is both the insurer and administrator of the Plan. Effective October 3, 2002, Prudential terminated Mrs. Lumbard's LTD benefits because it claimed that she was physically able to perform a job that would pay her a salary of at least $72,895 annually and therefore was no longer disabled as that term is defined by the Plan.

Prudential terminated Mrs. Lumbard's LTD benefits without having a medical doctor review her case and despite the conclusion of its own vocational rehabilitation consultant that Mrs. Lumbard was not able to perform any type of job that paid the requisite salary. Mrs. Lumbard then made three appeals to Prudential to have her benefits reinstated. Prudential denied the first two appeals in which, among other things, Prudential relied on an incorrect salary standard, misstated Mrs. Lumbard's job responsibilities at State Street, did not have a medical doctor review Mrs. Lumbard's records and continued to ignore the conclusion of its vocational expert. As for Mrs. Lumbard's third appeal, Prudential failed to issue a decision within the period established by ERISA regulations, prompting Mrs. Lumbard to commence this action. Thereafter, Prudential denied Mrs. Lumbard's third appeal without fully considering the evidence submitted by Mrs. Lumbard and improperly relying for the first time on a report of a medical doctor who reviewed Mrs. Lumbard's records.

Prudential's decision is subject to de novo review because the Plan does not clearly vest

---

duplication, the citations in this memorandum to exhibits and page numbers refer to the documents in Prudential's proposed record.

Prudential with discretion in making benefit eligibility determinations and even if Prudential had such discretion, it failed to exercise it by not deciding Mrs. Lumbard's last appeal within the deadline established by the ERISA regulations. Hence, Mrs. Lumbard's third appeal is deemed denied as a matter of law. Furthermore, for the same reason, Prudential's final decision and the doctor's report that Prudential relied on in denying Mrs. Lumbard's last appeal should be excluded from the administrative record.

But no matter what standard is employed, it is obvious that Prudential failed to conduct a full and fair review of Mrs. Lumbard's case. Prudential made decisions in which it made fundamental mistakes and ignored: (1) medical information provided by Mrs. Lumbard's treating physician showing that she has a severe degenerative condition in her knees that seriously restricts her physical abilities; (2) evidence that Mrs. Lumbard suffers from serious and chronic pain caused by her condition; (3) a decision by the Social Security Administration ("SSA") that Mrs. Lumbard is totally disabled; and (4) the opinions of three vocational experts, including one retained by Prudential, who concluded that Mrs. Lumbard is unable to work at any job that satisfies the Plan definition of a "gainful occupation." Hence, Prudential's decision is wrong and Mrs. Lumbard's LTD benefits should be reinstated as of October 3, 2002.

## FACTS

Mrs. Lumbard was employed by State Street from June 1995 to April 4, 2000 when she was forced to stop working due to a permanent and degenerative condition in to her knees that causes chronic and severe pain. (Ex. 77, DML 00419). While she worked for State Street, Mrs. Lumbard was a Business Development Officer and sold State Street's securities lending services. When she stopped working in April 2000, her salary was $104,136. (Ex. 11, DML 00075).

### Mrs. Lumbard's Medical Condition

As explained in a letter dated August 12, 2004, written by Dr. John Richmond, a noted orthopedic surgeon and Mrs. Lumbard's treating physician, Mrs. Lumbard suffers from:

> severe bilateral patellofemoral arthrosis. As a result of that, she has severe disability from both knees. She has marked crepitus of her knees and significant pain and swelling. She has been through multiple surgical procedures for this, as well as conservative treatments. She has pain about both the kneecaps and also extending down to her left tibia which has undergone a major osteotomy for realignment of the kneecaps.

Dr. Richmond further stated that he did not "anticipate . . . improvement at any time in the future" and more likely than not, Mrs. Lumbard "will have a gradual deterioration of her function in time." (Ex. 77, DML 00415).

Severe bilateral patellofemoral arthrosis and crepitus of both knees means that both of Mrs. Lumbard's knee caps dislocate and her femur and tibia are permanently misaligned. That condition causes her knee caps to grind against the bones in her legs and results in chronic and often severe pain. Moreover, this condition severely restricts Mrs. Lumbard's physical abilities and mobility. (Ex. 77, DML 00419).

### Mrs. Lumbard's Medical History

Mrs. Lumbard's problems with her knees date back to her early teens. [3] When she was about 15 years old, a doctor performed the first levage and debridement on her knees. That procedure involves scraping/filing down the bones and kneecaps, cleaning up any frayed cartilage and washing out the joints. Shortly thereafter, she underwent an operation that involved a proximal realignment of her left leg and during which two leg muscles were shortened and two were lengthened. In addition, one of her

---

[3] Mrs. Lumbard's maiden name is Madden and many of the documents in the administrative record refer to her by her maiden name. There is a document in the proposed administrative record that refers to Susan Madden (Ex. 112), but that is a medical record of someone other than Mrs. Lumbard.

kneecaps was shaved and holes drilled into it in an attempt to prevent the kneecap from dislocating and to ease the friction of bone on bone. (Ex. 77, DML 00419).

After turning 20 years old, Mrs. Lumbard had to have numerous levage and debridements as the pain worsened, her knees buckled more often and walking became more difficult. (Ex. 77, DML 00419-00420). In February 1998, while employed by State Street, Mrs. Lumbard underwent a distal realignment and osteotomy. That operation involved taking bone from Mrs. Lumbard's hip and breaking off 8 inches of her tibia bone. The bone taken from her hip was put into her tibia in an effort to allow her kneecap to ride higher and reduce the bone on bone friction. A large permanent screw was introduced to hold it all together and ligaments and tendons were reattached to try to "pull" the kneecap to prevent further dislocation. (Ex. 77, DML 00429-00421).

A few months after the surgery, it became apparent that the osteotomy was not healing properly as there was no new bone growth. (Ex. 77, DML 00420). Mrs. Lumbard then went onto an electric bone stimulator, 8-12 hours a day, everyday, for the next 6-8 months. Nevertheless, the metal screw was working its way out of her bone, a clear sign that her body was rejecting the screw, and in November 1998, the screw had to be removed. (Ex. 77, DML 00420).

In early 1999, Dr. Richmond thought the osteotomy was 50% healed. He told Mrs. Lumbard told that once a bone heals 50% it will always heal 100%. At that point she was cleared to return to work, albeit part time. But working was very difficult because of the pain and the instability of her knees. In fact, the pain was so intense that Mrs. Lumbard was often unable to do anything after work and even on weekends she stayed home and sat on the couch. (Ex. 77, DML 00420-00421). Because Mrs. Lumbard's pain was so intense, Dr. Richmond performed a CAT scan that revealed that her osteotomy had not healed beyond 50%. Dr. Richmond told Mrs. Lumbard that in all his years of practice, he had never seen that happen. (Ex. 77, DML 00421).

5

In April 2000, Mrs. Lumbard had to stop working for State Street because she was physically unable to perform the duties associated with her job. In that same month, Dr. Richmond performed a bone graft with cadaver bone, and a levage and debridement on both knees, but Mrs. Lumbard's condition did not improve. She underwent rehabilitation and began taking 50 mgs of Vioxx. Although that was the highest dosage allowed, it was not very effective. (Ex. 77, DML 00421). In November 2003, Mrs. Lumbard was given three shots of Synvisc over three weeks. Synvisc is an artificial "acid" that maximizes a person's own natural knee acid, but the shots did not alleviate her pain. Mrs. Lumbard discussed cortisone shots with Dr. Richmond, but he was concerned that cortisone would could cause long term damage. In June 2004, Dr. Richmond performed another levage and debridement on both knees. After that procedure, Dr. Richmond told Mrs. Lumbard that cortisone shots were not an option. (Ex. 77, DML 00421). Thus, there is no available medical treatment that will improve Mrs. Lumbard's condition or the pain associated with it.

## Mrs. Lumbard's Chronic Pain

In a statement describing her condition that was submitted to Prudential in connection with her final appeal, Mrs. Lumbard stated that "the pain in [her] knees and lower legs is constant, but the level or intensity of the pain is unpredictable. Some days, the pain in [her] right knee/leg is worse, some days the pain in [her] left knee/leg is worse, and some days, the pain in both knees/legs is bad." (Ex. 77, DML 00422). Thus, the extent of Mrs. Lumbard's physical activity depends on the pain she is feeling that day. One day Mrs. Lumbard may be able to perform most types of physical activities, but the next day, the pain is so intense she is unable to perform simple tasks. The same is true for different times of the same day. When Mrs. Lumbard is able to perform some household chores, she usually needs to take frequent breaks because of the pain. (Ex. 77, DML 00422). Even sleeping does not provide Mrs. Lumbard with much relief since the pain causes her to awake several times during the night. (Ex. 77,

6

DML 00423).

On many days, Mrs. Lumbard is unable to walk more than 100 to 200 feet and there are days when she is unable to walk at all. Her knees buckle often and she has to constantly be aware that she might fall at any time because of the buckling of her knees. Mrs. Lumbard avoids driving as much as possible and when she does drive, she tries to limit the total distance to about 10 miles. (Ex. 77, DML 00423).

Mrs. Lumbard's pain makes it impossible for her to work at any job for 8 hours a day for 50 weeks a year. She is not able to work at a sedentary position, such as an office receptionist, because while she may be able to perform even the limited tasks associated with such a position for one week, she cannot perform such tasks for two or three consecutive weeks, let alone 50 weeks a year. (Ex. 77, DML 00423).

In his August 12, 2004 letter, Dr. Richmond confirmed that Mrs. Lumbard's physical restrictions are "dramatic."

> [S]he is unable to walk more than 100 to 200 feet at certain times, although some days she has somewhat improved ambulatory ability. She can stand for no more than 15 minutes. She is unable to do stairs, ramps or climbing. She is even only capable of minimal household chores as a result of this. She is incapable of sitting for protracted periods of time because of severe pain with sitting, this precludes airplane travel or driving substantial distances.

Hence, Dr. Richmond concluded Mrs. Lumbard is not "currently employable nor will she [ever] be . . . ." (Ex. 77, DML 00415).

### The SSA's Decision

The Plan states that Prudential will offset LTD benefits by the amount of SSA disability benefits paid to Mrs. Lumbard. (Ex. 2, DML 00027). Hence, Prudential notified Mrs. Lumbard that she was obligated to seek such benefits. (Ex. 31, DML 00156).

Mrs. Lumbard complied with that obligation and an SSA Administrative Law Judge ("ALJ") found that her arthrosis is so debilitating that she is unable to perform any kind of job. In a Decision dated September 24, 2004 (Ex. 77, DML 00310-31) that was issued after a hearing at which Mrs. Lumbard and an independent vocational expert testified, the ALJ concluded that Mrs. Lumbard has been disabled since April 3, 2000 because she "has the following impairments which are considered to be 'severe' under Social Security Regulations: misalignment of knees resulting in chronic pain and chrondromalacia." The ALJ also concluded that Mrs. Lumbard "is unable to do sustained work activities in an ordinary work setting on a regular and continuing basis." (Ex. 77, DML 00312-00313).

The ALJ stated that in making those determinations he relied on various medical records including Dr. Richmond's August 12, 2004 letter. The ALJ noted that the medical evidence showed that Mrs. Lumbard has significant restrictions on her physical activities, that she can only walk for a brief period of time, is unable to stand for more than 15 minutes at a time and is unable to bend, stoop, lift or carry. (Ex. 77, 00311).

The ALJ concluded that Mrs. Lumbard's "description of her limitations is consistent with the record when considered in its entirety" and that she "cannot perform her past relevant work." Therefore, the ALJ considered whether "there are other jobs existing in significant numbers that [Mrs. Lumbard] can perform, consistent with the medically determinable impairments, age, education, and work experience." The SSA retained an independent vocational expert to testify at the hearing. The ALJ requested that the independent vocational expert "identify occupations a hypothetical person with [Mrs. Lumbard's] residual functional capacity and vocational factors . . . could perform." (Ex. 77, DML 00312). The vocational expert testified that "such a person would be unable to perform any jobs existing in significant numbers in the national economy." Therefore, the ALJ concluded that Mrs. Lumbard:

does not have skills which are transferable to work within her residual functional capacity. Residual functional capacity is [Mrs. Lumbard's] maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week or an equivalent work schedule. [Mrs. Lumbard] must have both the mental and physical abilities to perform sustained work activities. Because the evidence supports a finding that [Mrs. Lumbard] has had a substantial loss of ability to meet the demands of basic work related activities on a sustained basis, the unskilled sedentary occupational base is significantly eroded and a finding of disability is justified.

(Ex. 77, DML 00311-312).

## Relevant Plan Language

Despite this overwhelming evidence, Prudential claims that Mrs. Lumbard is not disabled as that term is defined by the Plan. The Plan contains two definitions of disability:

> You are disabled when Prudential determines that:
> -- you are unable to perform the material and substantial duties of your regular occupation due to your sickness and injury; and
> -- you have 20% or more loss in your indexed monthly earnings due to that sickness or injury.
>
> After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonable fitted by education, training or experience.

(Ex. 2, DML 00023). "Gainful occupation" is defined as a job that "is or can be expected to provide you with an income equal to at least 70% of your indexed monthly earnings within 12 months of your return to work." (Ex. 2, DML 00026). Mrs. Lumbard qualifies for Option II, and thus a "gainful occupation" for her is one that pays a minimum annual salary of $72,895. (Ex. 74, DML 00293).

## Prudential Terminates Mrs. Lumbard's LTD Benefits

By letter dated August 28, 2002, Prudential informed Ms. Lumbard that her LTD benefits would terminate as of October 3, 2002. (Ex. 44, DML 00190-191). That letter stated that the medical documentation showed that she was physically able to perform sedentary work and that:

9

> A Transferable Skills Analysis was performed which revealed several
> gainful jobs that you could perform based on your education,
> experience, training and physical abilities.  These jobs are, but not
> limited to a Securities Trader; $95,722 yearly, a Registered
> Representative; $64,448 yearly, a Banking, Loan Officer; $65,279
> yearly, and a Customer Service Supervisor; $57, 806 yearly.

Prudential's letter also declared (erroneously) that the Plan defined "Gainful occupation" as [a]n

occupation, including self employment, that is or can be expected to provide you with an income equal

to at least *50% for Option I or 60% for Option II*, of your indexed monthly earnings within 12 months

of your return to work." (emphasis added). (Ex. 44, DML 00190-00191).

### Mrs. Lumbard's First Appeal

Mrs. Lumbard appealed Prudential's decision in a letter from her attorney dated January 10,

2003. (ex. 59, DML 00216-226).  Mrs. Lumbard claimed that Prudential's decision was incorrect for

several reasons.  First, Prudential's definition of "gainful occupation" was wrong because it stated that

60% of her State Street salary as opposed to 70% was the salary benchmark for other jobs that she

could perform.  That mistake infected Prudential's transferable skills analysis because three of the four

positions referenced in Prudential's letter paid a salary less than $72,895. The only job identified by

Prudential that paid the requisite salary was Securities Trader ($95,722).  But, as the letter explained,

Mrs. Lumbard was not qualified for that position. Moreover, Prudential ignored the opinion of Rosalyn

Davidoff, a vocational specialist with Injury Management Resources, Inc. ("IMR"), who Prudential

assigned to work with Mrs. Lumbard. (Ex. 59, DML 00221-00222). In a report provided to Prudential

dated July 26, 2002, Ms. Davidoff stated that Mrs. Lumbard did not have the skills "to directly enter

into marketing or management positions," (Ex. 42, DML 00185), and that "there are no occupations at

a commensurate salary range that [Mrs. Lumbard] can enter with her current transferable skills." (Ex.

42, DML 00187). Finally, Prudential's so-called Transferable Skills Analysis, which was entitled

"Internal Employability Review," (Ex. 135, DML 00712), did not provide any explanation or factual support for its conclusion that Mrs. Lumbard was qualified to be a Securities Trader.

### Prudential Denies Mrs. Lumbard's First Appeal

By letter dated February 14, 2003, Prudential denied Mrs. Lumbard's first appeal. (Ex. 62, DML 00230-231). In that letter Prudential stated that it performed a "review of [Mrs. Lumbard's] job description as provided by her employer" and concluded that she was physically able and qualified to work as a Securities Trader and/or Registered Representative at an annual salary of at least $72,895. Prudential's conclusion derived in part from its erroneous belief that Mrs. Lumbard was a Registered Representative at State Street. (Ex. 62, DML 00230-00232). In that letter, Prudential corrected its mistaken definition of "Gainful occupation" and acknowledged that  that 70% of Mrs. Lumbard's indexed monthly earnings was $72,895. (Ex. 62, DML 00232).

### Mrs. Lumbard's Second Appeal

Mrs. Lumbard appealed Prudential's decision in a letter from her attorney to Prudential dated July 31, 2003. (Ex. 65, DML 00253-00263). In connection with that appeal, Mrs. Lumbard submitted a Vocational Analysis prepared by Robert Violetta (Ex. 64, DML 00242 - 252) who carefully explained that Mrs. Lumbard was not qualified for the positions identified by Prudential. In addition, Mr. Violetta, like Ms. Davidoff, concluded that Mrs. Lumbard "does not have the education, training, work experience, licensure/registration, transferable skills and demonstrated aptitudes which would qualify her to perform occupations offering gainful wages within her physical restrictions and limitations." (Ex. 64, DML 00249).

### Prudential's Denial of Mrs. Lumbard Second Appeal

By letter dated October 2, 2003, Prudential denied Ms. Lumbard's second appeal. (Ex. 74, DML 00293-294). Prudential's letter stated its denial was supported by "an external vocation analysis,

taking into consideration the concerns raised in the appeal." That analysis was conducted by Amy Vercillo (Ex. 69, DML 00279-285), who claimed that there were five "sedentary" managerial occupations in sales and marketing that Mrs. Lumbard was physically able and qualified to perform and that would pay her an annual salary of more than $72,895. Ms. Vercillo claimed that the physical demands of eight jobs she identified in those occupational areas were discussed with each employer, as well as the educational and work experience requirements, which she claimed included 5 years of selling banking products. (Ex. 69, DML 00282).

### Mrs. Lumbard's Third Appeal

Mrs. Lumbard appealed Prudential's denial of her second appeal in a letter from her attorney to Prudential dated December 23, 2004. (Ex. 77, DML 00299-309). Included with that appeal was a copy of the SSA's decision along with copies of the documents that were in evidence at the SSA hearing, including Dr. Richmond's August 12, 2004 letter; a statement signed by Mrs. Lumbard explaining her condition and the chronic pain that is caused by that condition; and a Vocational Analysis Report prepared by Mr. Violetta dated December 14, 2004. (Ex. 77, DML 00310-508).

The letter explained that Ms. Vercillo's report was flawed in the first instance because Mrs. Lumbard was not capable of sedentary work as demonstrated by Dr. Richmond's August 12, 2004 letter. In addition, Mrs. Lumbard's statement described how her constant pain seriously restricts her mobility and explained why she is not able to perform even sedentary work, let alone hold a job that pays more than $72,000 annually. (Ex. 77, DML 00301).

In his report (Ex. 77, DML 00424 - 507), Mr. Violetta explained that Dr. Richmond's August 12, 2004 letter, Mrs. Lumbard's statement and the SSA's decision demonstrated that Mrs. Lumbard was "not physically able to be gainfully employed in any occupation." (Ex. 77, DML 00424). Mr. Violetta also reviewed Ms. Vercillo's report and identified serious problems with her report. All of the

12

jobs identified by Ms. Vercillo involved managerial responsibilities, but Mrs. Lumbard had no such experience. Ms. Vercillo misunderstood the nature of Mrs. Lumbard's position with State Street, which was simply a sales position, and therefore erroneously concluded that Mrs. Lumbard had performed the duties of a Vice President, Financial Institution. (Ex. 77, DML –425-426). As a result, Ms. Vercillo wrongly believed that Mrs. Lumbard had managerial experience. (Ex. 77, DML 00427). Ms. Vercillo also wrongly believed that Mrs. Lumbard had 5 years experience selling banking products when she did not have such experience. Finally, Ms. Vercillo asserted that Mrs. Lumbard was capable of sedentary work, but the five occupations she listed in her report are classified as light exertional activities because of their travel requirements. (Ex. 77, DML 00427). Mrs. Lumbard is clearly unable to travel. Hence, Mr. Violetta showed that Ms. Vercillo's report was completely unreliable.

### Prudential Fails to Issue a Timely Decision on Mrs. Lumbard's Third Appeal

In a letter dated January 26, 2005, Prudential requested that Mrs. Lumbard provide additional medical records. (Ex. 79). Those records were sent to Prudential by letter dated February 17, 2005. (Ex. 80, DML 00511). In a letter to Ms. Lumbard's attorney dated March 24, 2005, Prudential stated that it needed an additional 45 days to "complete [its] review of her claim" and that she should notify Prudential immediately if that was not acceptable. (Ex. 83, DML 00517). Mrs. Lumbard agreed to Prudential's request by not providing such notice. The 45 day period extension period requested by Prudential expired on May 8, 2005.

In a letter dated May 18, 2005, Prudential stated that it was still unable to make a determination on Ms. Lumbard's appeal and would notify her attorney "within 30 days with the status of [its] evaluation if a decision [had] not yet been rendered." (Ex. 85, DML 00519). In a letter to Prudential dated May 31, 2005, Ms. Lumbard's attorney stated that Ms. Lumbard would not agree to Prudential's request and that Prudential was deemed to have denied Ms. Lumbard's final appeal because it failed to

issue a decision within the time prescribed by the regulations promulgated under ERISA. (Ex. 88, DML 00530). Hence, on May 31, 2005, Mrs. Lumbard commenced this action.

### Prudential Denies Mrs. Lumbard's Third Appeal

By letter dated June 8, 2005, Prudential denied Mrs. Lumbard's third appeal. (Ex. 91, DML 00540-542). In that letter, Prudential stated that Dr. William Abraham had reviewed Mrs. Lumbard's file and that he determined that she was that she was able to perform sedentary work. Prudential did not respond to Mr. Violetta's criticisms of Ms. Vercillo's report and merely restated Ms. Vercillo's finding that Mrs. Lumbard has the experience and skills to perform certain managerial occupations.

### ARGUMENT

**I.     Prudential's Decision Is Subject to De Novo Review Because The Plan Does Not Clearly Confer Discretion On Prudential With Respect To Determining Eligibility For LTD Benefits And Prudential Failed To Timely Act on Mrs. Lumbard's Final Appeal**

The threshold issue concerns the appropriate standard of review. When a plaintiff challenges a plan administrator's denial of benefits under ERISA § 1132(a)(1)(B), that denial is reviewed "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 (1989). If a plan administrator wants to reserve broad discretion to deny claims, "plan participants should be told this, and told clearly." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 333 (7th Cir. 2000). In *Brigham v. Sun Life of Canada*, 317 F.3d 72, 81 (1st Cir. 2003), the First Circuit fully endorsed that approach. Hence, the First Circuit has "steadfastly applied *Firestone* to mandate de novo review of benefits determinations unless 'a benefits plan . . . clearly grant[s] discretionary authority to the administrator.'" *Terry v. Bayer Corp.,* 145 F.3d 28, 37 (1st Cir. 1998) (emphasis added). In this case, the Plan language does not clearly vest discretion in Prudential and in

any event Prudential should not be accorded any deference because it failed to issue a decision on Mrs.

Lumbard's final appeal within the deadline established by the ERISA regulations.

### A.    The Plan Does not Clearly Confer Discretion on Prudential

The Plan states that Mrs. Lumbard is disabled "when Prudential determines" that she has

satisfied the necessary criteria. In *Nichols v. The Prudential Life Ins. Co.*, 406 F.3d 98, 109 (2d Cir.

2005), the Second Circuit held that the phrase that a disability exists "when Prudential determines" it

exists lacked "sufficient indicia of subjectivity" and therefore the plan did not vest any discretion in

Prudential. Other courts have reached the same result in construing identical language in plans

administered by Prudential. *See, e.g., Neumann v. Prudential Ins. Co. of America*, 367 F.Supp.2d 969,

974 (E.D.Va. 2005); *Urso v. Prudential Ins. Co. of America*, 2004 WL 3355265, at *2-3 (D.N.H.

2004); *O'Sullivan v. Prudential Ins. Co. of America*, 2001 WL 727033, at *2 (S.D.N.Y. June 28, 2001).

Hence, Prudential's decision is subject to de novo review.

### B.    Prudential Did Not Validly Exercise its Discretion Because It Failed to Timely Act on Mrs. Lumbard's Third Appeal

Alternatively, even if Prudential was vested with discretion, it did not validly exercise that

discretion here because it failed to issue a decision on Mrs. Lumbard's third appeal within the time period

established by the ERISA regulations. Those regulations require that in a claim for disability benefits, the

plan administrator must notify the claimant of its determination no later than 45 days after receipt of the

request for review. 29 C.F.R. 2560.503-1(i)(1)(i)-(3)(i). If the claimant agrees to an extension of time,

then the administrator must issue a decision within 45 days from the end of the initial 45 day period. 29

C.F.R. 2560.503-1(i)(1)(i)-(3)(i) and (i)(1)(1). In this case, Prudential did not issue its decision on Mrs.

Lumbard's final appeal within the 45-day extension period which expired on May 8, 2005. 29 C.F.R. §

2560.503-1(l) provides that if plan administrators fail to "follow claims procedures consistent with the

requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies . . . on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." Hence, Mrs. Lumbard's final appeal was deemed denied when Prudential's time for issuing a decision expired on May 8, 2005.

The First Circuit has not yet weighed in on issue of whether a "deemed denied" claim is subject to de novo review,[4] but several other courts of appeal have and the majority view is that the de novo standard applies when a claim is "deemed denied" for failure to decide an appeal before the regulatory deadline expires.  *See Nichols*, 406 F.3d at 109 (discussing the views of the various courts of appeal). In *Nichols*, the Second Circuit explained that the majority view is required by *Firestone* which in turn derived its holding from principles of trust law that "make a deferential standard of review appropriate when a trustee exercises discretionary powers." *Id*. Hence, the Second Circuit stated that deferential review should be given "only to actual exercises of discretion." *Id*. The Second Circuit reasoned that a "deemed denied" claim is not denied by any exercise of discretion, but rather by operation of law. Therefore, the Second Circuit stated that is would adopt the majority view and held that a "deemed denied" claim is subject to de novo review. *Id*.

This case is even more compelling than *Nichols* because there is no evidence that Prudential actually exercised any discretion that it may have had. In its October 2, 2003 letter, Prudential stated that Mrs. Lumbard's final appeal would be reviewed by Prudential's Appeals Committee (Ex. 74, DML 00294). Prudential's June 8, 2005 letter, however, does not state that the Appeals Committee considered Mrs. Lumbard's final appeal and Prudential has not produced any minutes of a meeting showing that its

---

[4] *But see Papdopoulos v. Hartford Life Ins. Co.*, 379 F.Supp.2d 117, 124 (D.Mass. 2005) (plan administrator's delinquent decision not subject to de novo review because it substantially complied with the regulatory deadline).

Appeals Committee ever met and reviewed Mrs. Lumbard's appeal or, if it did, what documents were provided to and reviewed by the Committee.  The absence of Appeals Committee documentation also suggests that even if the Committee met, it did not exercise its discretion and make its own determination, but simply rubber-stamped the conclusions presented to it. Thus, this procedural irregularity militates in favor of the application of the de novo standard of review.

It is also immaterial that the ERISA regulation that was applicable in *Nichols* was subsequently revised to eliminate the "deemed denied" language.  In *Stefansson v. The Equitable Life Ass. Soc. of the U.S.*, 2005 WL 2277486 (M.D.Ga. 2005), the plan administrator failed to issue a decision within the required time period and argued that the change in the phraseology of the ERISA regulations eliminated the concept of a "deemed denied" claim. The court, however, rejected that argument because "a plan's failure to make a benefits determination within the prescribed 45-day period still constitutes a constructive denial, just as it did with respect to pre-2002 claims." *Id.* at *9. The court explained that omission of the phrase "deemed denied" was insignificant because "deeming a claimant's administrative remedies to be exhausted is tantamount to deeming his claim denied."  *Id.* at *10. Hence, the Court held that the administrator's failure to render a benefits determination in accordance with the regulatory requirements resulted in use of the de novo standard of review *Id.* at 12.  Likewise, Prudential's failure to issue a timely decision on Mrs. Lumbard's third appeal requires that this Court review Prudential's decision under the de novo standard.

**II.      Prudential Wrongfully Denied Mrs. Lumbard's Claim**

Under the de novo standard, the Court reviews Prudential's decision to determine whether it was "correct." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 518 (1st Cir. 2005)  That means that the Court must independently weigh the facts and opinions in the record to determine whether Mrs.

17

Lumbard is disabled within the meaning of the Plan. The Court does not grant any deference to

Prudential's opinions or conclusions based on the facts. *See id.*

### A. Dr. Abraham's Report and Prudential's Third Decision Should Not Be Considered Part of the Administrative Record

Ordinarily, the court reviews the last and final decision of the plan administrator. *See Terry,*

145 F.3d at 36. That includes the materials that were in the plan administrator's "claims file at the time

it rendered its final determination." *Sidou v. UnumProvident Corp.*, 245 F.Supp.2d 207, 220 (D.Me.

2003). In a deemed denied case, the record is considered closed "as of a date contemporaneous with the

deemed denial . . . ." *Id.*

As of the date that Mrs. Lumbard's claim was deemed denied (May 8, 2005), Prudential's

claims file did not include Dr. Abraham's report, which is dated May 27, 2005, and Prudential's June 8,

2005 letter. Hence, those documents are not part of the administrative record and the Court should not

consider Dr. Abraham's report or Prudential's June 8 letter when reviewing Prudential's decision.

### B. The Court Must Remand the Matter to Prudential if Dr. Abraham's Report is Included in the Administrative Record

If the Court determines that Dr. Abraham's report should be included in the administrative

record, then the matter must be remanded to Prudential so that Mrs. Lumbard has the opportunity to

respond to Dr. Abraham's statements. *See, e.g., Abram v. Cargill, Inc.*, 395 F.3d 882 (8th Cir. 2005). In

*Abram*, after a disability claimant filed her appeal, the plan administrator requested that a medical doctor

review the evidence submitted by the claimant in support of her appeal. *Id.* at 885. Based on the doctor's

findings, the defendant denied the disability claim. *Id.* The Eighth Circuit held that the defendant had

violated ERISA's full and fair review requirements by not providing the claimant the opportunity to

respond to evidence acquired after her appeal opportunity had closed and therefore remanded the case to

the administrator. *Id.* at 886-888. The Eighth Circuit stated that ERISA requires a "meaningful

dialogue" between plan administrators and beneficiaries in order to ensure a full and fair review and "[t]here can hardly be a meaningful dialogue between the claimant and the [p]lan administrators if evidence is revealed only after a final decision." *Id.* at 886. Indeed, such "'gamesmanship' is inconsistent with full and fair review." *Id.; accord Rouse v. Unum Life Ins. Co. of America,*2005 WL 2000181 *9 (D.Minn. 2005); *Harris v. Aetna Life Ins. Co.*, 379 F.Supp.32d 1366, 1372-1375 (N.D.Ga. 2005).

Prudential waited until the last minute to have a doctor review Mrs. Lumbard's case and clearly relied on Dr. Abraham's report in denying Mrs. Lumbard's final appeal. Mrs. Lumbard did not have an opportunity to respond to Prudential's new evidence. Hence, if Dr. Abraham's report is included in the administrative record, then the matter must be remanded to Prudential so that Mrs. Lumbard can submit evidence that responds to or rebuts Dr. Abraham's report.

### C. Prudential Did Not Conduct A Full and Fair Review of Mrs. Lumbard's Appeal Because it Failed to Consider the Evidence <u>Submitted by Mrs. Lumbard in Connection with her Third Appeal</u>

The Plan requires that Prudential must pay LTD benefits to Mrs. Lumbard unless three criteria are satisfied: Mrs. Lumbard (1) is physically able and (2) is qualified, based upon her education, training and experience, to perform (3) a "gainful occupation," which is defined as one that must pay a minimum salary of $72,895. Prudential does not deny that Mrs. Lumbard has severe bilateral patellofemoral arthrosis. Mrs. Lumbard has provided abundant evidence to Prudential that demonstrates that her arthrosis results in severe and frequent pain that seriously restricts her physical activities. Mrs. Lumbard's condition is also permanent and will continue to worsen. Consequently, Mrs. Lumbard is "disabled" as that term is defined in the Plan. Prudential concluded otherwise because it conducted a selective review and failed to consider all of the evidence submitted by Mrs. Lumbard. Thus, Prudential did not afford Mrs. Lumbard a "full and fair review" as mandated by ERISA.

ERISA provides that "every employee benefit plan must provide participants whose benefits claims were denied with a full and fair review" of the denial. 29 U.S.C. § 1133. A "full and fair review" means, among other things, that the plan administrator "takes into account all comments, documents, records and other information submitted by the claimant . . . ." 29 C.F.R § 2560.503-1(h)(2)(iv). Thus, plan administrators have a duty "to weigh conflicting evidence." *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 32 (1st Cir. 2001).

Prudential did not conduct a "full and fair review" of Mrs. Lumbard's claim for numerous reasons. First, Prudential's initial decision to terminate Mrs. Lumbard's LTD benefits was not based on any consideration of the medical evidence and ignored Ms. Davidoff's report.  Prudential then erroneously denied Mrs. Lumbard's first appeal because it was mistaken about the Plan's definition of "gainful occupation" and her qualifications to be a Securities Trader. Thus, Prudential had no basis for its decision to terminate Mrs. Lumbard's benefits as of October 3, 2002 and at a minimum, Mrs. Lumbard's benefits must be reinstated through October 1, 2003.

Prudential's decision must be evaluated only on the basis of its October 2, 2003 decision in which it denied Mrs. Lumbard's second appeal because of its failure to timely respond to Mrs. Lumbard's third appeal.  The October 2, 2003 decision shows that Prudential failed to consider all of Mrs. Lumbard's medical records and Dr. Richmond's August 12, 2004 letter, Mrs. Lumbard's chronic and severe pain, the SSA's decision that Mrs. Lumbard is totally disabled and Mr. Violetta's criticisms of Ms. Vercillo's report. Hence, Prudential's "deemed denial" of Mrs. Lumbard's final appeal was wrong.

1. **Prudential did not Consider all of Mrs. Lumbard's Medical Records and the Opinions of Her Treating Physician**

Dr. Richmond's August 12, 2004 letter stated that Mrs. Lumbard's condition resulted in

physical restrictions that were "permanent" and "dramatic." Hence, Dr. Richmond's opinion was that

Mrs. Lumbard was not "employable nor will she be as a result" of her condition. Prudential denied

Mrs. Lumbard's claim for disability benefits without addressing Dr. Richmond's evaluation of her

condition. Indeed, as of the date that Prudential is deemed to have denied Mrs. Lumbard's final appeal,

Prudential had failed to have her medical records reviews by a doctor. While plan administrator is not

required to accord special weight to the opinions of a claimant's treating physician, plan administrators

"may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating

physician." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 833 (2003). Prudential's failure to

consider all of Mrs. Lumbard's medical records and Dr. Richmond's assessment of her condition means

that its decision is not credible and is incorrect.

### 2.    Prudential Failed to Consider That Mrs. Lumbard's Condition Causes Chronic and Severe Pain

Prudential also refused to credit the reliable evidence concerning Mrs. Lumbard's chronic and

severe pain. "[P]ain is an important factor in determining disability." *Mimms v. Heckler,* 750 F.2d 180,

185 (2d Cir. 1984). Hence, a plan administrator must consider the evidence of pain submitted by a

beneficiary and the administrator's failure to do so means that its decision is invalid.  *See, e.g.,*

*Govindarajan v. FMC Corp.,* 932 F.2d 634 (7th Cir.1991) (plan administrator's decision arbitrary and

capricious where administrator concluded there was no physical cause for plaintiff's back pain

notwithstanding reports from treating physicians that plaintiff suffered from herniated disc and lower

back pain and was totally disabled due to this condition); *Pollini v. Raytheon Disability Employee Trust,*

54 F.Supp.2d 54, 59-60 (D.Mass.1999) (finding administrator's denial of benefits arbitrary and

capricious, in part for failing to credit subjective evidence of pain in medical records).    Prudential

completely disregarded Mrs. Lumbard's pain in claiming she is not disabled. Prudential failed to explain

how Mrs. Lumbard could perform a well-paying sales job that requires traveling when most days Mrs.

Lumbard is in such pain that she can barely walk or drive and is unable to sit for any prolonged period

of time.  Those omissions are sufficient to establish that Prudential's decision is incorrect.

### 3.    Prudential Failed to Address the SSA's Determination That Mrs. Lumbard is Totally Disabled

There can be no question that Mrs. Lumbard suffers from a clinically determinable medical

impairment that can reasonably be expected to produce chronic and severe pain.  Based on that

evidence, the SSA concluded that Mrs. Lumbard is physically unable to perform any job, let alone one

that pays almost $73,000 a year.  Prudential's failure to even consider the SSA's determination is

relevant to the Court's review and shows that Prudential consistently ignored evidence that did not

support its position.

Although the SSA's determination of a claimant's entitlement to disability benefits is not

binding on plan administrators, it can be relevant to the administrator's determination whether the

claimant is eligible for disability benefits. *Pari-Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230

F.3d 415, 420 (1st Cir.2000). Here the SSA's decision is highly relevant for several reasons. First, the

Plan requires Mrs. Lumbard to seek SSA benefits because Prudential can use those benefits to offset the

payments it has made and will make to Mrs. Lumbard.  Thus, Prudential embraces the SSA's decision

for its own benefit, but then turns a blind eye when the SSA's decision presents a problem for

Prudential. That, coupled with Prudential's failure to address the merits of the SSA's decision, reveals

the inadequacy of Prudential's evaluation of Mrs. Lumbard's appeal.  *See Calvert v. Firstar Finance,*

*Inc.,* 409 F.3d 286, 294-95 (6th Cir. 2005).

Second, the standard for receipt of SSA disability benefits is considerably more stringent that

that required by the Plan. To qualify for SSA disability insurance benefits, Mrs. Lumbard had to prove

that she was "disabled." 42 U.S.C. §§ 423(a)(1)(D), 1382(a)(1). That means that Mrs. Lumbard's physical impairment is "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(1)(A), 1382c(a)(3)(B). In reaching his decision that Mrs. Lumbard was unable to work at any job,  the ALJ relied on the opinion of an independent vocational expert who testified at the hearing that Mrs. Lumbard was physically unable to work at any such job. (Ex. 77. DML 00312).

In addition, the ALJ found that the Mrs. Lumbard suffered from "chronic pain" that rendered her unable to work. (Ex. 77, DML 00310). In order to reach that conclusion, the ALJ had to follow the stringent guidelines that SSA has established for evaluating subjective complaints of pain. Those guidelines required the ALJ to "evaluate the intensity and persistence of [the claimant's] symptoms so that [it] can determine how [the] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c). The evidence submitted to the ALJ and to Prudential shows that Mrs. Lumbard's pain severely restricts her activities; that the pain is frequent and intense, that medication has not been effective in alleviating the pain and that there is no course of treatment available that will relieve pain or the condition causing the pain.  These conditions prevent Mrs. Lumbard from working at any job, let alone a managerial position that pays $72,895 per year and  requires energy and stamina. Prudential's failure to consider the SSA's decision shows that its decision is incorrect.

### 4.    Prudential Failed to Consider Mr. Violetta's Report

Finally, Prudential failed to consider the report prepared by Mrs. Lumbard's vocational expert, Robert Violetta.  Mr. Violetta explains that the medical evidence shows that Mrs. Lumbard is completely disabled from performing any job, not just a sedentary job. Mr. Violetta's report also is critical of Ms. Vercillo's identification of Mrs. Lumbard's occupational skills and her assertion that the

23

jobs Mrs. Lumbard can perform are classified as sedentary. Mr. Vercillo incorrectly believed that Mrs. Lumbard's job with State Street was the equivalent of a Vice President, Financial Institution which involves managerial responsibilities. Hence, all of the jobs identified by Ms. Vercillo were managerial positions. Mr. Violetta carefully explained that Ms. Vercillo egregiously misunderstood the nature of Mrs. Lumbard's work at State Street and, as a result, mistakenly concluded that Mrs. Lumbard had management experience and 5 years experience in banking product sales. (Ex. 77, DML 425-427). Mrs. Lumbard's position at State Street did not entail any management responsibilities nor the sale of banking products and therefore Mrs. Lumbard is not qualified for the positions identified by Ms. Vercillo. (Ex. 77, DML 00427). In addition, Mr. Violetta showed that the jobs identified by Ms. Vercillo are considered light exertional jobs, not sedentary jobs, because of their travel requirements and Mrs. Lumbard is clearly unable to travel. Hence, Prudential's failure to address Mr. Violetta's criticisms of Ms. Vercillo's report demonstrate that Prudential was intent on denying her claim, did not afford Mrs. Lumbard a full and fair review and its decision is incorrect.

### III.    Prudential's Decision Cannot Stand Even if Dr. Abraham's Report and Prudential's Third Letter Denying Mrs. Lumbard Appeal are Considered Part of the Administrative Record

Even if Dr. Abraham's May 27, 2005 report and Prudential's June 8, 2005 letter are considered to be part of the administrative record, Prudential's decision remains incorrect. In its June 8 letter, Prudential claims that Dr. Abraham reviewed Mrs. Lumbard's file and concluded that she is able to perform sedentary work. Dr. Abraham reached that conclusion because he relied on outdated medical records and acknowledged that the medical records showed as of February 28, 2002 that Mrs. Lumbard was able to walk for only a "brief period," that she "was unable to stand for more than fifteen minutes at a time and she was unable to bend, stoop, lift or carry." (Ex. 86, DML 00524). Dr. Abraham also noted Mrs. Lumbard's physical restrictions described in Dr. Richmond's August 12, 2004 letter.

Dr. Abraham also states that "[i]f her underlying degenerative changes were as significant as described, then she would be limited in her abilities to sit, stand, walk, bend, climb and carry." (Ex. 86, 00525). Dr. Abraham has no basis, however, for concluding that Mrs. Lumbard's condition is not as described by Dr. Richmond and he concedes that he has "little to offer in terms of management of [Mrs. Lumbard's] severe patellofemoral degenerative joint disease . . . ." (emphasis added). (Ex. 86, DML 526). Nevertheless, Dr. Abraham inexplicably concludes that Mrs. Lumbard is able to perform a "sedentary" job where the "overwhelming majority of her work activities would be done in a sitting position with limited periods of standing, walking and occasional stair climbing" and ability to lift at maximum 10 pounds. (Ex. 86, DML 00525).

But the most startling feature of Dr. Abraham's report is that he does not even once refer to Mrs. Lumbard's pain in the sections of his report entitled "Reviewer Advisory" and "Assessment" (Ex. 86, DML 00525-526). That omission by itself establishes that Prudential did not afford Mrs. Lumbard a "full and fair" review of her appeal.

Dr. Abraham also states Mrs. Lumbard's limitations based on "her subjective complaints" are not "inconsistent with the documented" information. Thus, he admits that Mrs. Lumbard's physical restrictions as described in her statement are consistent with her severe arthrosis. But then he somehow incredibly concludes that in his opinion, those complaints "do not rise to the level of complete and total impairment . . ." There is an unbridgeable gulf, however, between those statements.

While a decision denying benefits may be based on the reasoned opinion of a non-examining, reviewing physician, *Matias-Correa v. Pfizer, Inc.*, 345 F.3d 7, 12 (1st Cir.2003), it would be an understatement to say that Dr. Abraham did not issue a reasoned opinion. Dr. Abraham concedes that Mrs. Lumbard's condition is "severe," does not dispute Dr. Richmond's assessment of Mrs. Lumbard's physical restrictions nor Mrs. Lumbard's description of her physical restrictions. That evidence shows

25

that Mrs. Lumbard is often unable to walk more than 100 to 200 feet, cannot stand for no more than 15 minutes, is unable to do stairs, ramps or climbing, and cannot sit for any length of time. Dr. Abraham also failed to consider Mrs. Lumbard's chronic pain. Hence, Dr. Abraham's conclusion that Mrs. Lumbard is able to perform sedentary work is not credible.

Furthermore, Dr. Abraham did not consider the SSA's determination that Mrs. Lumbard is not capable of working at any job, even a sedentary one. Dr. Abraham also did not consider Mr. Violetta's report or even that of Ms. Vercillo. Since Dr. Abraham did not opine on whether Mrs. Lumbard can perform the managerial jobs identified by Ms. Vercillo, his report provides no support for Prudential's decision

Finally, Prudential's third letter simply repeats what Ms. Vercillo previously told Prudential. Prudential thereby not only ignored Mr. Violetta's criticisms of Ms. Vercillo's report, but also ignored the opinion of the vocational expert who testified on behalf of the SSA and Ms. Davidoff's opinion. All of those experts were unable to identify any job that Mrs. Lumbard can perform that qualifies as a "gainful occupation" under the Plan. Prudential simply engaged in opinion-shopping when it did not like what it was told by Ms. Davidoff and so it retained Ms. Vercillo to provide a different opinion. Then when Mr. Violetta showed that Ms. Vercillo's report was seriously flawed, Prudential failed to respond to those criticisms. Thus, Prudential's decision set forth in its third letter is incorrect.

IV.     **Prudential's Denial of Mrs. Lumbard's Appeal is Wrongful Even Under The Arbitrary and Capricious Standard**

Even assuming that the Court concludes that Prudential's decision is entitled to review under the arbitrary and capricious standard and considers Dr. Abraham's report and Prudential's June 2005 letter, Prudential's decision cannot survive. Under that standard, Prudential's decision must fail if it "was unreasonable in light of the information available to it." *Pari-Fasano v. ITT Hartford Life &*

*Accident Ins. Co.,* 230 F.3d at 419).  But while the arbitrary and capricious standard is deferential, the Court must still examine the quality and quantity of the evidence and the opinions on both sides of the issues to determine if Prudential's decision was reasonable.

As explained above, Prudential arbitrarily and capriciously discounted all of the evidence that Mrs. Lumbard provided to show that she is disabled; failed to follow its own vocational consultant's conclusion about Mrs. Lumbard's employment prospects, arbitrarily ignored Mrs.Lumbard's statements about how she is incapacitated by pain, her treating physician's statements and the SSA's determination that she is totally disabled and the problems identified by Mr. Violetta with Ms. Vercillo's report.

Prudential's one-sided and result-oriented review is completely at odds with the role of a disinterested fiduciary.  Hence, even under the arbitrary and capricious standard, Prudential's decision cannot survive.

### V.    The Court Should Order Prudential To Reinstate Mrs. Lumbard's LTD Benefits Retroactive to October 3, 2002

After a court has found that a plan administrator erroneously terminated disability benefits, the court has the discretion to "either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive benefits." *Cook v. Liberty Life Ass. Co. of Boston,* 320 F.3d 11, 24 (1st Cir. 2003).  Prudential's egregious mishandling of Mrs. Lumbard's case has been completely inconsistent with the purposes of ERISA  Hence, this Court should order Prudential to reinstate Mrs. Lumbard's LTD benefits retroactive to October 3, 2002.

### CONCLUSION

For the foregoing reasons, the Court should allow Mrs. Lumbard's motion for summary judgment and reinstate her LTD benefits retroactive to October 3, 2002 or remand the matter to

Prudential to allow Mrs. Lumbard to respond to Dr. Abraham's report.

DEBORAH M. LUMBARD

By her attorneys,

/s/ James T. Finnigan
James T. Finnigan (BBO # 549620)
Rich May, a Professional Corporation
176 Federal Street
Boston, MA 02110
(617) 556-3872

Dated:  October 31, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for the other parties by first class mail on October 31, 2005

/s/ James T. Finnigan
James T. Finnigan