THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DEBORAH M. LUMBARD,                  )
                                     )
    Plaintiff,                       )
                                     )
    v.                               )      C.A. No.  05-CV-11124-PBS
                                     )
THE PRUDENTIAL INSURANCE             )
COMPANY OF AMERICA and               )
STATE STREET BANK AND TRUST          )
COMPANY,                             )
                                     )
    Defendants.                      )

### PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, plaintiff Deborah M. Lumbard submits this Statement of Undisputed Material Facts in support of her motion for summary judgment.

### UNDISPUTED MATERIAL FACTS

1.    Deborah M. Lumbard was employed by State Street Bank and Trust Company ("State Street") from June 1995 to April 4, 2000. (Ex. 44, DML 00190; Ex. 77, DML 00419).[1]

2.    While she worked for State Street, Mrs. Lumbard was a Business Development Officer 2 and sold State Street's securities lending services. (Ex. 11, DML 00075; Ex. 13, DML 00080).

3.    Mrs. Lumbard had to stop working for State Street because she has a medical condition with her knees known as bilateral patellofemoral arthrosis. (Ex. 77, DML 00419).

4.    When Mrs. Lumbard stopped working in April 2000, her salary was

---

[1]  The exhibit and page numbers refer to the documents submitted by Prudential that Prudential maintains constitute the administrative record. As explained in Mrs. Lumbard's memorandum in support of her motion for summary judgment, she maintains that certain documents should not be considered part of the administrative record.

$104,136. (Ex. 55, DML 00712).

5.      State Street is the sponsor of an employee benefit plan known as the State Street Bank and Trust Company Weekly Disability Coverage and Long Term Disability Coverage for All Employees ("Plan"). (Ex. 2, DML 00045).

6.      Prudential Insurance Company of America ("Prudential") is both the insurer and administrator of the Plan. (Ex. 2, DML 00017).

7.      The Plan contains two definitions of disability:

> You are disabled when Prudential determines that:
> -- you are unable to perform the material and substantial duties of your regular occupation due to your sickness and injury; and
> -- you have 20% or more loss in your indexed monthly earnings due to that sickness or injury.
>
> After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonable fitted by education, training or experience.

(Ex. 2, DML 00023).

8.      The Plan defines "Gainful occupation" as a job that "is or can be expected to provide you with an income equal to at least 50% of Option I or 70% for Option II, of your indexed monthly earnings within 12 months of your return to work." (Ex. 2, DML 00023).

9.      Mrs. Lumbard qualifies for Option II and thus a "gainful occupation" for her is one that pays a minimum annual salary of $72,895. (Ex. 74, DML 00293).

10.     Mrs. Lumbard was paid LTD benefits from October 3, 2000 to October 2, 2002 because Prudential determined that she "was unable to perform the material and substantial duties of [her] regular occupation due to . . . sickness and injury" and she had "20% or more loss in . . . indexed monthly earnings due to that sickness or injury. " (Ex. 62, DML 00230-231).

11.    In a letter dated August 12, 2004, Dr. John Richmond, Mrs. Lumbard's treating physician, dated August 12, 2004, stated that Mrs. Lumbard has:

> severe bilateral patellofemoral arthrosis. As a result of that, she has severe disability from both knees. She has marked crepitus of her knees and significant pain and swelling. She has been through multiple surgical procedures for this, as well as conservative treatments. She has pain about both the kneecaps and also extending down to her left tibia which has undergone a major osteotomy for realignment of the kneecaps. (Ex. 77, DML 00415).

12.    In his August 12, 2004 letter, Dr. Richmond further stated that he did not "anticipate . . . improvement at any time in the future" and more likely than not, Mrs. Lumbard "will have a gradual deterioration of her function in time." (Ex. 77, DML 00415).

13.    Severe bilateral patellofemoral arthrosis and crepitus of both knees means that both of Mrs. Lumbard's knee caps dislocate and her femur and tibia are permanently misaligned. (Ex. 77, DML 00419).

14.    That condition causes Mrs. Lumbard's knee caps to grind against her bones and results in chronic and often severe pain. (Ex. 77, DML 00419).

15.    Mrs. Lumbard's condition severely affects and restricts her physical abilities and movements. (Ex. 77, DML 00419).

16.    Mrs. Lumbard's problems with her knees date back to her adolescence. (Ex. 77, DML 00419).

17.    In February 1998, while employed by State Street, Mrs. Lumbard underwent a distal realignment and osteotomy that involved taking bone from her hip, breaking off 8 inches of her tibia bone and putting the bone from her hip into her tibia, thereby creating a 'bump' that was intended to allow her kneecap to ride higher and thus create less bone on

3

bone friction. (Ex. 77, DML 00420).

18.     In addition, during that operation a large permanent screw was introduced in her knee to hold it together and ligaments and tendons were reattached to try to "pull" the kneecap to prevent further dislocation. (Ex. 77, DML 00420).

19.     A few months after the surgery, however, Mrs. Lubard's osteotomy was not healing properly as there was no new bone growth. (Ex. 77, DML 00420).

20.     Mrs. Lumbard then went onto an electric bone stimulator, 8-12 hours a day, everyday, for the next 6-8 months in an effort to have the osteotomy heal completely. (Ex. 77, DML 00420).

21.     In November 1998, the screw had to be removed because it was working its way out of her bone, a clear sign that her body was rejecting the screw. (Ex. 77, DML 00420).

22.     In or about January/February 1999, Dr. Richmond thought the osteotomy was 50% healed and Mrs. Lumbard returned to work on a part time basis. (Ex. 77, DML 00420).

23.     Mrs. Lumbard found working to be very difficult because of the pain and the instability of her knees. (Ex. 77, DML 00420-00421).

24.     Because the pain was so intense, Dr. Richmond performed a CAT scan that revealed that Mrs. Lumbars's osteotomy had not healed beyond 50%. (Ex. 77, DML 00421).

25.     In April 2000, Mrs. Lumbard had to stop working for State Street because she was physically unable to perform the duties associated with her job. (Ex. 62, DML 00230-231).

26.     In that same month, Dr. Richmond performed a bone graft with cadaver bone, and a levage and debridement on both knees, but Mrs. Lumbard's condition did not improve.

(Ex. 77, DML 00421).

27.    Mrs. Lumbard also began taking 50 mgs of Vioxx, which, although was the highest dosage allowed, was not very effective. (Ex. 77, DML 00421).

28.    In November 2003, Mrs. Lumbard was given three shots of Synvisc, an artificial "acid" that maximizes a person's own natural knee acid, over three weeks, but the Synvisc did not alleviate her pain. (Ex. 77, DML 00421).[2]

29.    Mrs. Lumbard discussed cortisone shots with Dr. Richmond, but he was reluctant to submit her to such a regimen because he thought that the shots would break down the joint even more.  (Ex. 77, DML 00421).

30.    Furthermore, there are areas in both of her knees that have no cartilage at all and cortisone shots could cause long term damage. (Ex. 77, DML 00421).

31.    In June 2004, Dr. Richmond performed another levage and debridement on both knees. (Ex. 77, DML 00421)

32.    After that procedure, Dr. Richmond told Mrs. Lumbard that cortisone shots were not an option. (Ex. 77, DML 00421).

33.    Mrs. Lumbard suffers from chronic and often intense pain as a result of her severe bilateral patellofemoral arthrosis and crepitus.   (Ex. 77, DML 00422-23).

34.    That pain affects Mrs. Lumbard's ability to perform all types of physical activities. (Ex. 77, DML 00421).

35.    When Mrs. Lumbard is able to perform some chores around the house, she usually needs to take frequent breaks because of the pain or in order to prevent the pain from

---

[2]    In her Mrs. Lumbard's statement, it states that Synvisc "minimizes" a person's natural knee acid. That is a typographical error.

getting worse. (Ex. 77, DML 00422).

36.    Because of the pain, Mrs. Lumbard is not able to sleep for 8 continuous hours and usually is only able to sleep 4-5 hours consecutively. (Ex. 77, DML 00423).

37.    On many days, Mrs. Lumbard is unable to walk more than 100 to 200 feet and there are days when she is unable to walk at all.  (Ex. 77, DML 00423).

38.    Mrs. Lumbard's knees buckle often and she has to constantly be aware that she might fall at any time because of the buckling of her knees. (Ex. 77, DML 00423).

39.    Mrs. Lumbard avoids driving as much as possible and when she does drive, she tries to limit the total distance to about 10 miles. (Ex. 77, DML 00423).

40.    Mrs. Lumbard's pain and physical restrictions make it impossible for her to work at any job for 8 hours a day for 50 weeks a year. (Ex. 77, DML 00423).

41.    Mrs. Lumbard is not able to work at a sedentary position, such as an office receptionist, because while she may be able to perform even the limited tasks associated with such a position for one week, she cannot perform such tasks for two or three consecutive weeks, let alone 50 weeks a year. (Ex. 77, DML 00423).

42.    In his August 12, 2004 letter, Dr. Richmond stated that Mrs. Lumbard's physical restrictions are "dramatic."

> [S]he is unable to walk more than 100 to 200 feet at certain times, although some days she has somewhat improved ambulatory ability.  She can stand for no more than 15 minutes.  She is unable to do stairs, ramps or climbing.  She is even only capable of minimal household chores as a result of this.  She is incapable of sitting for protracted periods of time because of severe pain with sitting, this precludes airplane travel or driving substantial distances.

> In that same letter, Dr. Richmond concluded Mrs. Lumbard is not "currently

6

employable nor will she [ever] be . . . ." (Ex. 77, DML 00415).

43.    As of June 3, 2001, Prudential had retained Injury Management Resources, Inc. ("IMR") to "assess [Mrs. Lumbard's] suitability for vocational rehabilitation assistance, and identify interventions that will assist with a timely return-to-work."   (Ex. 26,  p. 00137)

44.    In a report dated July 26, 2002 that was given to Prudential, Rosalynn Davidoff an IMR Vocational Specialist, stated that Mrs. Lumbard did not have the skills "to directly enter into marketing or management positions," (Ex. 42, DML 00185), and that "there are no occupations at a commensurate salary range that [Mrs. Lumbard] can enter with her current transferable skills."(Ex. 42, DML 00187).

45.    By letter dated August 28, 2002, Prudential informed Ms. Lumbard that her LTD benefits would terminate as of October 3, 2002. (Ex. 44, DML 00190-00191).

46.    Prudential's letter stated that:

> A Transferable Skills Analysis was performed which revealed several gainful jobs that you could perform based on your education, experience, training and physical abilities.  These jobs are, but not limited to a Securities Trader; $95,722 yearly, a Registered Representative; $64,448 yearly, a Banking, Loan Officer; $65,279 yearly, and a Customer Service Supervisor; $57, 806 yearly. (Ex. 44, DML 00190-00191).

47.    Prudential's letter also stated that the Plan defined "Gainful occupation" as [a]n occupation, including self employment, that is or can be expected to provide you with an income equal to at least 50% for Option I or 60% for Option II, of your indexed monthly earnings within 12 months of your return to work." (Ex. 44, DML 00190-00191).

48.    The definition of "Gainful occupation" set forth in Prudential's letter was incorrect. (Ex. 2, DML 00023).

49.    Three of the occupations listed in the TSA did not pay a salary that was 70%

or more of Mrs. Lumbard's final salary at State Street. (Ex. 44, DML 00190-00191).

50.     The Transferable Skills Analysis ("TSA") referred to in Prudential's letter was entitled "Internal Employability Review." (Ex. 135, DML 00712).

51.     Mrs. Lumbard is not qualified to work as a Securities Trader. (Ex. 58, DML 00215; Ex. 59, DML 00225-226; Ex. 64, DML 00246-249).

52.     In a letter from Prudential dated October 2, 2002, Prudential described the three appeal procedures available under the Plan and stated that upon receipt of a third appeal, will be directed to Prudential's Appeals Committee" and "the decision of the Appeals Committee will be final . . . ." (Ex. 55, DML 00211-212).

53.     Mrs. Lumbard appealed Prudential's decision in a letter from her attorney dated January 10, 2003. (Ex. 59, DML 00216-226).

54.     By letter dated February 14, 2003, Prudential denied Mrs. Lumbard's first appeal. (Ex. 62, DML 00230-233).

55.     In that letter Prudential stated that it performed a "review of [Mrs. Lumbard's] job description as provided by her employer" and that "part of [Mrs. Lumbard's] regular occupation as a Registered Representative has a skill set and licensing that would be directly applicable to an occupation of Securities Trader" (Ex. 62, DML 00230-231).

56.     Mrs. Lumbard's regular occupation at State Street did not involve being a Registered Representative. (Ex. 64, DM 00245).

57.     Mrs. Lumbard appealed Prudential's decision in a letter from her attorney to Prudential dated July 31, 2003. (Ex. 65, DML 00253-00263).

58.     In connection with that appeal, Mrs. Lumbard submitted a Vocational Analysis prepared by Robert Violetta dated July 9, 2003. (Ex. 64, DML 00242 - 252).

8

59.     Mr. Violetta stated in his report that Mrs. Lumbard was not qualified to perform the occupation of Registered Representative or Securities Trader because she lacked the transferable skills and she did have the "required licensure or registration" for those occupations. (Ex. 64, DM 00245).

60.     Mr. Violetta also stated in his report that Mrs. Lumbard "does not have the education, training, work experience, licensure/registration, transferable skills and demonstrated aptitudes which would qualify her to perform occupations offering gainful wages within her physical restrictions and limitations." (Ex. 64, DML 00249).

61.     By letter dated October 2, 2003, Prudential denied Ms. Lumbard's second appeal. (Ex. 74, DML 00293-294).

62.     Prudential's letter stated that it had "arranged for an external vocation analysis, taking into consideration the concerns raised in the appeal." (Ex. 74, DML 00293).

63.     Prudential relied upon a Transferable Skills Analysis/Labor Market Survey dated September 15, 2003 prepared by Amy Vercillo. (Ex. 69, DML 00279-285).

64.     Ms. Vercillo claimed that there were five "sedentary" occupations that Mrs. Lumbard was physically able to perform and which would pay her an annual salary of more than $72,895. (Ex. 69, DML 00281-282).

65.     Ms. Vercillo claimed that there were eight (8) sedentary jobs within those five occupations that Mrs. Lumbard was physically able and qualified to perform and which would pay her an annual salary of more than $72,895. (Ex. 69, DML 00281-282).

66.     All of the occupations identified by Ms. Vercillo had the word "manager" included in their title. (Ex. 69, DML 00281).

67.     All of the jobs identified by Ms. Vercillo had the word "manager" included in

9

their title or description. (Ex. 69, DML 00282-283).

68.     Ms. Vercillo's report does not state that she considered State's Street's description of Mrs. Lumbard's job as a New Business Officer.  (Ex. 69, DML 00279).

69.     Ms. Vercillo's report did not identify any managerial experience that Mrs. Lumbard had. (Ex. 69, DML 00279).

70.     Ms. Vercillo stated that she contacted eight (8) employers and asked if they "would consider a candidate with a Bachelor's degree, 7 years experience in computer sales and 5 years experience in banking product sales." (Ex. 69, DML 00282-283).

71.     Mrs. Lumbard never sold any bank products such as commercial lending, bank loans, CDs, etc. and did not have 5 years experience in banking product sales. (Ex. 77, DML 00425).

72.     Mrs. Lumbard has no experience as a manager. (Ex. 77, DML 00425-426)

73.     In letters dated July 31, 2001 and October 16, 2001, Prudential informed Mrs. Lumbard that the Plan required her to "make 'timely and diligent pursuit' of Social Security Disability Benefits (SSDB) through the Administrative Law Judge level.  (Ex. 28, DML 00149; Ex. 31, DML 00156).

74.     On August 13, 2004, a hearing was held before an Administrative Law Judge ("ALJ") in the Social Security Administration ("SSA") on Mrs. Lumbard's appeal of the denial of her request for SSDB. (Ex. 77, DML 00310).

75.     Mrs. Lumbard and Ronald Hampton, a vocational expert, testified at that hearing. (Ex. 77, DML 00310).

76.     The ALJ "called upon the vocational expert to identify occupations a hypothetical person with [Mrs. Lumbard's] residual functional capacity and vocational

10

factors . . . could perform" and the "vocational expert testified that such a person would be unable to perform any jobs existing in significant numbers in the national economy." (Ex. 77, DML 00312).

77.    In a Decision dated September 24, 2004 (Ex. 77, DML 00310-13), the ALJ concluded that Mrs. Lumbard has been disabled since April 3, 2000 because, among other things, she has a severe impairment and "there are no jobs existing in significant numbers which she can perform." (Ex. 77, DML 00312-13).

78.    Mrs. Lumbard appealed Prudential's denial of her second appeal in a letter from her attorney to Prudential dated December 23, 2004. (Ex. 77, DML 00299-309).

79.    Included with that appeal was a copy of the SSA's decision along with copies of the documents that were in evidence at the SSA hearing, including Dr. Richmond's August 12, 2004 letter; a statement signed by Mrs. Lumbard explains her condition and the chronic pain that is caused by that condition; and a Vocational Analysis Report prepared by Mr. Violetta dated December 14, 2004. (Ex. 77, DML 00310-508).

80.    Mrs. Lumbard's statement described that her constant pain seriously restricts her physical movements and explained why she is not able to perform even sedentary work, let alone hold a job that pays more than $72,000 annually. (Ex. 77, DML 00301).

81.    In his report (Ex. 77, DML 00424 - 507), Mr. Violetta stated that he had reviewed  Dr. Richmond's August 12, 2004 letter, Mrs. Lumbard's statement and the SSA's decision and concluded that Mrs. Lumbard was "not physically able to be gainfully employed in any occupation." (Ex. 77, DML 00424-28).

82.    Mr. Violetta explained that Mrs. Lumbard does not have the management experience or skills to perform the eight jobs within the five occupations identified by Ms.

11

Vercillo. (Ex. 77, DML 00427).

83.     Mr. Violetta also stated that the five occupations listed by Ms. Vercillo in her report are classified as light exertional activity because of their travel requirements. (Ex. 77, DML 00427).

84.     Mrs. Lumbard is unable to travel. (Ex. 77, DML 00415).

85.     In a letter dated January 26, 2005, Prudential requested that Mrs. Lumbard provide additional medical records. (Ex. 79, DML 00510).

86.     Mrs. Lumbard's attorney sent additional records to Prudential by letter dated February 17, 2005. (Ex. 80, DML 00511).

87.     In a letter to Ms. Lumbard's attorney dated March 24, 2005, Prudential stated that it needed an additional 45 days to "complete [its] review of her claim" and that she should notify Prudential immediately if that was not acceptable. (Ex. 83, DML 00517).

88.     Mrs. Lumbard did not notify Prudential that such extension was unacceptable.

89.     Prudential failed to issue a decision on Mrs. Lumbard's third appeal within 45 days of March 24, 2005.

90.     By a letter dated May 18, 2005, Prudential stated that it was still unable to make a determination on Ms. Lumbard's appeal and would her attorney "within 30 days with the status of [its] evaluation if a decision [had] not yet been rendered." (Ex. 85, DML 00519).

91.     In a letter to Prudential dated May 31, 2005, Ms. Lumbard's attorney stated that Ms. Lumbard would not agree to Prudential's request. (Ex. 88, DML 00530).

DEBORAH M. LUMBARD

By her attorneys,


/s/ James T. Finnigan
James T. Finnigan (BBO # 549620)
Rich May, a Professional Corporation
176 Federal Street
Boston, MA 02110
(617) 556-3872

Dated:  October 31, 2005


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for the other party by first class mail on October 31, 2005.

/s/ James T. Finnigan
James T. Finnigan

13