THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBORAH M. LUMBARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 05-CV-11124-PBS |
| ) | |
| THE PRUDENTIAL INSURANCE ) | |
| COMPANY OF AMERICA and ) | |
| STATE STREET BANK AND TRUST ) | |
| COMPANY, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Deborah M. Lumbard submits this memorandum in opposition to the defendants' motion for summary judgment. In the interest of brevity, this memorandum assumes the Court's familiarity with the references, facts and arguments in the memoranda submitted by the parties in support of their motions for summary judgment. Thus, this memorandum simply responds to the arguments in the defendants' memorandum in support of their summary judgment motion ("Def. Memo.").

**ARGUMENT**

**I.    Prudential's Decision Is Subject to De Novo Review Because The Plan
Does Not Clearly Confer Discretion on Prudential And Prudential Failed
To Follow Its Own Appeals Procedures**

The parties disagree with respect to the appropriate standard of review. Mrs. Lumbard's position is that the Court should apply a de novo standard of review for the reasons set forth in the memorandum in support of her summary judgment motion. Prudential, on the other hand, argues that the deferential arbitrary and capricious standard should be used. But Prudential's argument is

unpersuasive because the Plan does not <u>clearly</u> confer discretion on Prudential and Prudential failed to follow its own appeals procedures.

### A. The Plan Does not Clearly Confer Discretion on Prudential

The Plan states that Mrs. Lumbard is disabled "when Prudential determines" that she has satisfied the necessary criteria. (Ex. 2, DML 00023). As explained in Mrs. Lumbard's summary judgment memorandum, two Circuit Courts of Appeals and several district courts have held that such language does not clearly confer discretionary authority on Prudential. Prudential contends that Judge Stearns held that this language gave discretionary authority to Prudential in *McLaughlin v. Prudential Life Ins. Co. of Am.*, 319 F.Supp.2d 115 (D.Mass. 2004) (Def. Memo, p. 10). But that assertion is disingenuous because the plaintiff in that case conceded the issue, obviating the need for any discussion or ruling. *Id.* at 124 (stating that "[t]he parties agree that the Plan unambiguously grants the plan administrator discretion to make benefits determinations . . ."). Prudential also relies on a peremptory Endorsement issued by Judge Lasker in *McEleny. Prudential Ins. Co. of America* (D.Mass. 2004) (Def. Memo, p. 10). Judge Lasker's decision did not include any recitation of the plan language at issue or an explanation as to why he concluded that the plan in question gave discretionary authority to Prudential.

In *Urso v. Prudential Ins. Co. of America*, 2004 WL 3355265, at *2-3 (D.N.H. 2004), Prudential made the same argument it makes here. The court rejected Prudential's argument. The court explained that:

> courts disagree as to whether the language used in its plan is sufficient to confer discretion. *Compare Eubanks v. Prudential Ins. Co. of Am.*, 336 F.Supp.2d 521, 528 (M.D.N.C.2004) (holding identical language sufficient to confer discretion); *Mitchell v. Prudential Health Care Plan*, 2002 WL 1284947, at *7 (D.Del. June 10, 2002) (same), *with Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir.2000) (stating that "the mere fact that the plan requires a determination of

eligibility or entitlement by the plan administrator" was insufficient to confer discretionary authority); *Diaz v. Prudential Ins. Co. of Am.*, 2004 WL 1094441, at *6 (N.D.Ill. May 13, 2004) (accord); *McDonald*, 2002 WL 122382, at *2-3 (accord and discussing cases).

The *Urso* court concluded that the disagreement among the courts was sufficient to show that such language does not clearly confer discretionary authority on Prudential. Absent such clear language, the Plan does not give Prudential any discretion with respect to determining Mrs. Lumbard's eligibility for LTD benefits.

### B.     Prudential Failed to Follow its Own Appeals Procedures

Prudential advised Mrs. Lumbard that her final appeal would be considered by Prudential's Appeals Committee. (Ex. 71, DML 00289). Prudential has failed to produce any evidence that its Appeals Committee ever met and considered Mrs. Lumbard's final appeal. Prudential has not provided an affidavit from any member of the Appeals Committee or any employee of Prudential attesting that the Committee met and reviewed Mrs. Lumbard's final appeal and what documents were included in the Committee's review. Indeed, Prudential's June 8, 2005 letter does not even mention any such meeting of the Appeals Committee. Thus, Prudential failed to follows its own appeals procedures and that failure by itself warrants the application of de novo review. *See, e.g., Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted"); *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999) (concluding that *de novo* review was warranted where "procedural irregularities in the initial claims process and an unfair appeals process" tainted plan administrator's benefits decision).

## II. Prudential's October 2, 2003 Decision Must be Considered Its Final Decision

Mrs. Lumbard does not contest that Prudential's decision must be evaluated based on the administrative record. But, as Mrs. Lumbard argues in her summary judgment memorandum, there is an issue as to what documents should be included in the administrative record and which decision constitutes Prudential's final decision.

Mrs. Lumbard maintains that Prudential's June 8, 2005 decision (Ex. 91) and the May 27, 2005 report of Dr. Abraham (Ex. 86) referenced in that letter should not be considered part of the administrative record because Prudential is deemed to have denied Mrs. Lumbard's final appeal when it failed to timely issue a decision on that appeal by May 8, 2005. Prudential does not dispute that it failed to issue a timely decision.

Nonetheless, Prudential argues that its June 8, 2005 decision is its final decision that must be reviewed by this Court. Prudential justifies that argument by citing to *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510 (1st Cir. 2005). But in *Orndorf* there was no dispute as to what was the final decision of the plan administrator and so that case does not assist Prudential. Instead, in a deemed denied case, the record is considered closed "as of a date contemporaneous with the deemed denial . . . ." *Sidou v. UnumProvident Corp.*, 245 F.Supp.2d 207, 220 (D.Me. 2003). Here, the administrative record closed on May 8, 2005 when Prudential failed to issue its decision on Mrs. Lumbard's final appeal. Moreover, as explained above, Prudential did not follow its own appeals procedures in denying Mrs. Lumbard's claim. Thus, Prudential's June 8, 2005 decision should not be considered the final decision and Dr. Abraham's report should not be considered part of the administrative record. Rather, Prudential's October 2, 2003 letter (Ex. 74) should be considered its final decision because that was the last decision made by Prudential before May 8, 2005.

4

### III. Prudential Arbitrarily And Capriciously Denied Mrs. Lumbard's Claim

Assuming that this Court reviews Prudential's decision under the arbitrary and capricious standard, Prudential's October 2, 2003 decision (Ex. 74) and even its June 8, 2005 (Ex. 91) decision do not survive even that deferential standard. Both of those decisions are afflicted with several infirmities, not the least of which is that they fail to show that Prudential failed to consider the evidence submitted by Mrs. Lumbard and lack any reasoned explanation as to why that evidence was not credited by Prudential.

#### A. Prudential's October 2, 2003 Decision Was Arbitrary and Capricious

The Plan requires that Prudential must pay LTD benefits to Mrs. Lumbard unless three criteria are satisfied: Mrs. Lumbard (1) is physically able and (2) qualified, based upon her education, training or experience, to perform (3) a "gainful occupation," which is defined as one that must pay a minimum salary of $72,895. (Ex. 2, DML 00023, 00026). Prudential claims that its October 2, 2003 decision was supported by substantial evidence for two reasons. First, Dr. Richmond, Mrs. Lumbard's treating physician, had stated back in 2001 that Mrs. Lumbard was able to sit up to six hours per day, walk for one hour per day and stand one hour per day with rest; and 2) a vocational analysis report prepared by Amy Vercillo, a vocational consultant retained by Prudential, stated that Mrs. Lumbard had the education, training or experience to perform five "sedentary" managerial occupations in sales and marketing that paid an annual salary of more than $72,895. (Def. Memo, pp. 17-18).

Prudential, however, wants this Court to ignore the fact that as of May 8, 2005, the date when Prudential is deemed to have denied Mrs. Lumbard's final appeal, it was in possession of substantial new evidence submitted by Mrs. Lumbard on December 23, 2004 (Ex. 77). Therefore, when Prudential denied Mrs. Lumbard's final appeal on May 8, 2005

5

without issuing a decision, its last written decision was its October 2, 2003 letter. As of May 8, 2005, Prudential had failed to consider Mrs. Lumbard's new evidence. Hence, Prudential's May 8, 2005 denial was arbitrary and capricious for that reason alone. *See Halpin v. W.W. Grainger, Inc.,* 962 F.3d 685, 695 (7th Cir. 1992) ("within reasonable limits, the reasons for rejecting evidence must be articulated if there is to be meaningful appellate review"). Indeed, Prudential's May 8, 2005 denial should be considered arbitrary and capricious as a matter of law because of its failure to consider and address Mrs. Lumbard's new evidence as of that date. *See Killian v. Healthsource Provident Adm'rs, Inc.,* 152 F.3d 514, 521 (6th Cir.1998) ("The key question . . . is what constitutes the universe of information that [the plan administrator] should have considered" and administrator acted arbitrarily and capriciously in limiting the information it took into account). Therefore, Prudential's October 2, 2003 decision was arbitrary and capricious because Prudential failed to take into account the evidence that Mrs. Lumbard submitted in connection with her final appeal and explain why that evidence was inadequate to show that she was disabled.

Prudential also apparently believes that if its October 2, 2003 decision is considered the final decision, then that decision should be considered in light of the evidence that had been submitted to Prudential as of that date. That is just plain wrong. The Plan provided Mrs. Lumbard with three levels of appeal and three opportunities to present evidence in support of her claim. Prudential's failure to issue a timely decision on Mrs. Lumbard's final appeal does not mean that Mrs. Lumbard's evidence submitted in support of her final appeal is excluded. Instead, Prudential's second decision must be reviewed in light of all of the evidence Mrs. Lumbard submitted as of May 8, 2005. Otherwise, Prudential would be

rewarded and Mrs. Lumbard would be prejudiced by Prudential's dilatory handling of her final appeal.

### 1. Prudential's Claim that Mrs. Lumbard is Able to Perform Sedentary Work is Arbitrary and Capricious

Prudential's second decision rests in part on an evaluation of Mrs. Lumbard's physical abilities that Dr. Richmond prepared on January 10, 2001. (Ex. 111, DML 00579-580). But Dr. Richmond's most recent evaluation of Mrs. Lumbard's condition, which is found in his letter dated August 12, 2004, is much different. In that letter, he stated that Mrs. Lumbard suffers from:

> severe bilateral patellofemoral arthrosis. As a result of that, she has severe disability from both knees. She has marked crepitus of her knees and significant pain and swelling. She has been through multiple surgical procedures for this, as well as conservative treatments. She has pain about both the kneecaps and also extending down to her left tibia which has undergone a major osteotomy for realignment of the kneecaps.

(Ex. 77, DML 00415). Dr. Richmond further stated that he did not "anticipate . . . improvement at any time in the future" and more likely than not, Mrs. Lumbard "will have a gradual deterioration of her function in time." (Ex. 77, DML 00415).

Severe bilateral patellofemoral arthrosis and crepitus of both knees means that both of Mrs. Lumbard's knee caps dislocate and her femur and tibia are permanently misaligned. That condition causes her knee caps to grind against the bones in her legs and results in chronic and often severe pain. Moreover, this condition severely restricts Mrs. Lumbard's physical abilities and mobility. (Ex. 77, DML 00419).

In his August 12, 2004 letter, Dr. Richmond described Mrs. Lumbard's physical restrictions as "dramatic."

> [S]he is unable to walk more than 100 to 200 feet at certain times, although some days she has somewhat improved ambulatory ability. She can stand for no more than 15 minutes. She is unable to do stairs, ramps or climbing. She is even only capable of

> minimal household chores as a result of this. She is incapable of sitting for protracted periods of time because of severe pain with sitting, this precludes airplane travel or driving substantial distances.

Hence, Dr. Richmond concluded Mrs. Lumbard is not "currently employable nor will she [ever] be . . . ." (Ex. 77, DML 00415).

Mrs. Lumbard also stated in the statement that was provided to Prudential that she often suffers from severe and frequent pain that seriously restricts her physical activities and therefore is physically incapable of performing sedentary work. (Ex. 77, DML 00415; 00419-423). An administrative law judge ("ALJ") in the Social Security Administration ("SSA") who heard Mrs. Lumbard's testimony as well as that of the SSA's independent vocational expert also concluded that such evidence demonstrated that Mrs. Lumbard lacked the residual functional capacity to perform any kind of sedentary work. (Ex. 77, DML 00310-013.)

Prudential, however, denied Mrs. Lumbard's claim for disability benefits without addressing Dr. Richmond's most recent evaluation of her condition or the SSA's conclusion that she is unable to perform sedentary work. While a plan administrator is not required to accord special weight to the opinions of a claimant's treating physician, plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 833 (2003). In fact, as of May 8, 2005, the date that Prudential is deemed to have denied Mrs. Lumbard's final appeal, Prudential had failed to have her medical records reviewed by a doctor.

In addition, it is obvious that the sedentary jobs identified by Ms. Vercillo that pay an annual salary of $72,895 require the ability to concentrate for many hours of the workday. There is no evidence that Prudential considered Mrs. Lumbard's pain. It is unreasonable for Prudential to believe that Mrs. Lumbard's pain would not prevent her from concentrating on

the jobs Prudential claimed she could perform. In any event, as part of the full and fair review that Prudential is required to afford Mrs. Lumbard, it was obligated to explain how Mrs. Lumbard is to perform stressful managerial jobs despite her chronic pain. Prudential's failure to provide such an explanation speaks volumes about its inability to do so.

The evidence establishes overwhelmingly that Mrs. Lumbard is not physically able to perform any type of sedentary work, let alone demanding managerial jobs. Hence, this Court does not need to take the next step and consider whether Prudential had any basis for concluding that Mrs. Lumbard was qualified by virtue of her education, training or experience to perform sedentary jobs that paid an annual salary of at least $72,895.

2. **Prudential's Opinion That Mrs. Lumbard is Qualified by Education, Training or Experience to Perform Managerial Occupations That Pay at Least $72,895 Annually is Arbitrary and Capricious**

Assuming that the Court does consider whether Prudential showed that Mrs. Lumbard was qualified by virtue of her education, training or experience to perform sedentary jobs that paid an annual salary of at least $72,895, then the Court must conclude that Prudential also failed in that regard. Prudential's only support for that claim is Ms. Vercillo's vocational analysis report. (Ex. 69). That report is so flawed, however, that it is inconceivable that a reasonable plan administrator would rely on it, particularly after it was advised of the problems that plagued that report.

Before explaining why Ms. Vercillo's report is so flawed, it is important to note that Prudential never explained why it rejected the conclusions of Rosalyn Davidoff, a vocational expert retained by Prudential who met with and spent considerable time working with Mrs. Lumbard in 2002 trying to find position that Mrs. Lumbard was able and qualified to perform that would pay at least $72,895 annually. (See. Exs. 36-43, 47-48). Ms. Davidoff was unable to find such a job. In a report dated July 26, 2002, Ms. Davidoff stated that Mrs. Lumbard did not have the skills to directly enter into marketing

9

or <u>management</u> positions," (Ex. 42, DML 00185) (emphasis added), and she could not locate any "occupations at a commensurate salary range that [Mrs. Lumbard] can enter with her transferable skills." (Ex. 42, DML 00 187). Prudential has not provided any basis for its rejection of Ms. Davidoff's conclusion. In fact, in light of Ms. Davidoff's reports, Prudential had no reason to seek the opinion of another vocational expert unless, of course, it wanted an expert who would tell Prudential that Mrs. Lumbard could perform managerial jobs despite having no managerial experience. Prudential was able to find such a person in Ms. Vercillo. Prudential's opinion-shopping showed that it was acting more "as an adversary 'bent on denying'" Mrs. Lumbard's claim than as a disinterested fiduciary. *Friedrich v. Intel Corp.*, 181 F.3d at 1110.

As for Ms. Vercillo, she stated in her report that Mrs. Lumbard's education, training or experience qualified her to perform five managerial occupations that were classified as sedentary work and paid at least $72,895 annually. (Ex. 69, DML 00281). According to Ms. Vercillo, she identified eight specific managerial jobs within those occupations and discussed the physical demands of those jobs with each employer, as well as the educational and work experience requirements for those jobs. (Ex. 69, DML 00281-282). In identifying those jobs, Ms. Vercillo believed (mistakenly) that Mrs. Lumbard's work experience included 5 years of selling banking products. (Ex. 69, DML 00282).

Robert Violetta, a vocational expert retained by Mrs. Lumbard, critiqued Ms. Vercillo's report in a Vocational Analysis Report dated December 14, 2004. (Ex. 77, DML 00310-508). Mr. Violetta concluded that Ms. Vercillo was "wrong with respect to [her] belief that Mrs. Lumbard has the skills, experience and mobility requirements" to perform the jobs she identified. (Ex. 77, DML 00428).

Mr. Violetta pointed out that Ms. Vercillo concluded that Mrs. Lumbard's job with State Street Bank and Trust Company (" State Street") was the equivalent of three occupations found in the Dictionary of Occupational Titles ("DOT"): Vice President - Financial Services (DOT

#186.117-078); Sales Representative - Financial Services DOT #250.257-022); and Sales Representative – Computers (DOT #275.257-010). (Ex. 77, DML 00425; Ex. 69, DML 00279). Based on that information, Ms. Vercillo stated that Mrs. Lumbard had the certain transferable skills including the following:

> Directs and coordinates, through subordinate managerial personnel, activities of department, administrative division, or specific function of financial institution.
>
> Coordinates activities of assigned program, such as sales, operations, or electronic financial services, determines methods and procedures for carrying out program, and assists interpreting policies and practices.

(Ex. 77, DML 00426- 427; Ex. 69 DML 00280).

But Ms. Vercillo was badly mistaken about Mrs. Lumbard's work experience at State Street. While she worked for State Street, Mrs. Lumbard was a Business Development Officer and sold State Street's securities lending services. (Ex. 11, DML 00075). Mrs. Lumbard's State Street job involved sales and no managerial responsibilities. As Mr. Violetta stated:

> it is in my opinion that Mrs. Lumbard's work history consists of only 2 Dictionary Of Occupational Titles occupations – Sales Representative, Financial Services DOT#250.257-022 and Sales Representative, Computers and EDP Systems (DOT#275.257-010). Mrs. Lumbard's work experience does not include Vice President, Financial Institution DOT#186.117-078. The basis for this assertion is that Mrs. Lumbard only performed one of the material duties of this occupation i.e., soliciting new business which is also a key material duty of Sales Representative occupations. Other than soliciting new business, none of the material duties of Vice President, Financial Institution have ever been identified in any job description provided to Prudential, nor have they ever been identified by Mrs. Lumbard.

(Ex. 77, DML 00425).

To confirm that, Mr. Violetta (unlike Ms. Vercillo) contacted Jay Carty, a Vice President of Sales and Client Services at State Street, who was Mrs. Lumbard's manager at State Street. Mr. Carty told Mr. Violetta that:

11

> Mrs. Lumbard had no management responsibilities in her prior position. She didn't manage people, coordinate activities of subordinates or manage a budget. He further stated that Mrs. Lumbard did not perform any of the duties or responsibilities which I recited to him for Vice President, Financial Institution DOT#186.117-078 other than solicit new business.

(Ex. 77, DML 00426). Mr. Violetta also obtained information about Mrs. Lumbard's State Street's job from State Street's Human Resources department:

> On 01/08/04, Ms. Nancy Altamonte, Human Resources and Organizational Performance Representative, State Street Bank, provided me with a notated copy of Vice President, Financial Institution COT#186.117-078 and a job description for Business Development Officer 2 (Exhibit 3). The job description identifies a sales, individual contributor role and no management of people, budgets, projects, departments, etc. The annotated DOT description for Vice President, Financial Institution provided by Ms. Altamonte indicates that the only material duties Mrs. Lumbard performed in this occupational description were providing marketplace feedback to be used in the development and recommendation of plans for expansion of programs, operations and financial activities; and the solicitation of new business or participation in community or service organizations.

(Ex. 77, DML 00426). Consequently, Mr. Violetta concluded that Mrs. Lumbard "never performed the duties or responsibilities of Vice President, Financial Institution at State Street." (Ex. 77, DML 00426).

In addition, Ms. Vercillo based her opinion on other erroneous information about Mrs. Lumbard's work experience. When contacting employers about the occupations she identified, she asked if they would consider a candidate with a bachelor's degree, 7 years experience in computer sales and 5 years experience in banking product sales. (Ex. 69, DML 00282). Mrs. Lumbard, however, has no experience in selling banking products. (Ex. 77, DML 00427). Hence, Mr. Violetta further concluded that any:

> skills and management of people, budgets and projects must be eliminated and not considered when attempting to identify appropriate employment options because Mrs. Lumbard never developed or demonstrated them in her work experience. This is important because without these transferable skills, Mrs. Lumbard will not qualify for any of the 5 occupations identified in Ms. Vercillo's report.

(Ex. 77, DML 00427).

Finally, Mr. Violetta explained that there were other problems with Ms. Vercillo's labor market survey findings:

> To begin, I do not believe that the findings demonstrate a variety of appropriate sales and marketing positions available. Of the eight employers contacted by Ms. Vercillo, three involved customer service manager positions and the other five were for sales manager positions. Second, most, if not all of the positions described in Ms. Vercillo's labor market survey require significant travel which is light exertional activity and even Ms. Vercillo noted that Ms. Lumbard was only able to perform only sedentary work. Third, Mrs. Lumbard is not qualified for the positions identified by Ms. Vercillo because of Mrs. Lumbard's lack of management experience and skills, and lack of experience with traditional banking products.
>
> Employer phone numbers were provided by the names of contact persons spoken were not provided. I attempted to contact the employers listed in Ms. Vercillo's report but was unable to speak to any individuals with any of the employers listed in Ms. Vercillo's report.
>
> For these reasons I conducted an independent Internet job search web site research at www.jobfind.com and www.monster.com on 01/09/04 for positions and employers corresponding to the 5 occupations identified by Ms. Vercillo.
>
> Mrs. Lumbard cannot meet the travel requirements of any of these jobs nor is she qualified to perform the account manager position with Thomson Financial. The other positions either require extensive travel (regional sales manager, Interconnect Systems, Inc. and business development manager, Snowbound Software), management experience (regional manager, CCP Industries; district sales manager, MRI@BrilliantPeople.com; branch bank sales manager, Hoffman Recruiters; internet marketing manager,

>TJX Companies; and marketing communications manager, DentaQuest) or licensure (market support supervisor, Mellon Financial Corporation).

(Ex. 77, DML 00427-428). Thus, Mr. Violetta's labor market survey confirmed that Mrs. Lumbard was "not qualified for and/or cannot meet the requirements for any of the occupations identified in Ms. Vercillo's report." (Ex. 77, DML 00429).

In sum, Ms. Vercillo's report is replete with mistakes. When those mistakes were pointed out to Prudential, Prudential simply turned a blind eye. At a minimum, Prudential must show that Mrs. Lumbard is qualified by reason of her education, training or experience to perform sedentary jobs that pay $72,895 annually. Prudential has no reliable vocational analysis that shows that. Hence, its October 2, 2003 decision is arbitrary and capricious for that reason alone.

Furthermore, even if this Court considers Prudential's October 2, 2003 decision to be the final decision and somehow reviews that decision based only on the evidence submitted to Prudential as of that date, then the Court must exclude Ms. Vercillo's report from its review. The reason for that exclusion is that on October 2, 2003, Prudential notified Mrs. Lumbard for the first time that it was relying on Ms. Vercillo's report and, as of that date, Mrs. Lumbard had not had the opportunity to respond to that report. *See, e.g., Abram v. Cargill, Inc.*, 395 F.3d 882, 886 (8th Cir. 2005). Thus, Prudential's October 2, 2003 decision must be evaluated in light of the so-called Transferable Skills Analysis ("TSA") referred to its August 28, 2002 letter in which it first advised Mrs. Lumbard of the termination of her LTD benefits. Mr. Violetta's July 9, 2003 report shows that Prudential's TSA was mistaken in almost every respect. (Ex. 64, DML 00242-249). Thus, no matter which decision is considered to be Prudential's final decision, Prudential has no support for its claim that Mrs.

Lumbard is qualified by her education, training or experience to perform a sedentary job that pays at least $72,895 annually.

### B. Prudential's June 8, 2005 Decision Was Arbitrary and Capricious

Even if Dr. Abraham's May 27, 2005 report and Prudential's June 8, 2005 letter are included in the administrative record, Prudential's decision is still arbitrary and capricious. First, there is nothing in the administrative record that shows that Prudential's Appeals Committee ever reviewed the evidence submitted by Mrs. Lumbard and made an independent determination of her claim for reinstatement of her LTD benefits before the June 8, 2005 decision was issued. Second, Prudential's June 8, 2005 decision simply rubber-stamped the flawed reports of Dr. Abraham and Ms. Vercillo.

#### 1. Prudential's June 8, 2005 Decision is Arbitrary and Capricious Because Prudential's Appeals Committee Did Not Review The Evidence Submitted by Mrs. Lumbard

As discussed above, Prudential failed to comply with its own procedures for handling administrative appeals when its Appeals Committee failed to meet and consider the evidence submitted by Mrs. Lumbard in connection with her final appeal. Thus, Prudential did not afford Mrs. Lumbard her contractual rights under the Plan and failed to provide her with a "full and fair" review of her final appeal. Prudential's failure to follow its own appeals procedures is sufficient in and of itself to show that its denial of Mrs. Lumbard's final appeal was arbitrary and capricious.

#### 2. Prudential's June 8, 2005 Decision is Arbitrary and Capricious Because Prudential Relied on the Flawed Reports of Ms. Vercillo and Dr. Abraham

In its June 8, 2005 letter, Prudential states that Mrs. Lumbard's final appeal was denied because the reports of Ms. Vercillo and Dr. Abraham showed that Mrs. Lumbard was not "disabled" as that term is defined in the Plan. As explained above, Ms. Vercillo's report is completely unreliable. Despite being provided with Mr. Violetta's December 14, 2004 report explaining the serous flaws in Ms. Vercillo's

report, Prudential blindly adhered to Ms. Vercillo's report. Prudential's silence about Mr. Violetta's report was unreasonable because Prudential must weigh all of the evidence submitted by Mrs. Lumbard and articulate the reasons for rejecting that evidence. *Halpin v. W.W. Grainger, Inc.,* 962 F.3d at 695. Moreover, Prudential's reliance on Mrs. Vercillo's flawed report establishes that Prudential's June 8, 2005 decision was arbitrary and capricious because Prudential had no support for its claim that there are jobs that pay a minimum of $72,895 annually that Mrs. Lumbard is qualified to perform because of her education, training or experience. But if any further evidence is necessary to show that Prudential's June 8, 2005 decision was arbitrary and capricious, Prudential's reliance on Dr. Abraham's misbegotten report is the clincher.

To begin with, Dr. Abraham's report should be viewed with a good deal of skepticism. A physician retained by a plan administrator may have an incentive to make a finding of 'not disabled' in order preserve his own consulting arrangements. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832 (2003). At the very least, a plan administrator, in choosing the independent experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a "clear incentive to contract with individuals who were inclined to find in its favor that [a claimant] was not entitled to continued [disability] benefits." *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 292 (6th Cir. 2005) (noting that the "possible conflict of interest inherent in this situation should be taken into account as a factor in determining whether [a plan administrator's] decision was arbitrary and capricious").

In addition, whether a doctor has physically examined the claimant is another factor that may be considered in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician. *See Calvert,* 409 F.3d at 295 (noting that the failure to conduct a physical examination may, in some

16

cases, raise questions about the thoroughness and accuracy of the benefits determination"). Dr. Abraham never examined Mrs. Lumbard or spoke with Dr. Richmond.

Dr. Abraham's report produced for Prudential contains 5 pages of text. (Ex. 86, DML 00522-526), but little substance. One page simply recites the questions he was asked to answer, two pages consist of his summary of Mrs. Lumbard's medical records and two pages are dedicated to his observations about those records. Most of the latter are little more than Dr. Abraham's conclusory assertions. Dr. Abraham never mentioned Mrs. Lumbard's pain and never explained how someone with Mrs. Lumbard's condition --- which he acknowledges is severe --- could be expected to function on a daily basis in a stressful managerial position. Indeed, there is no evidence that Dr. Abraham considered Ms. Vercillo's report. Thus, his opinion that Mrs. Lumbard is able to perform a sedentary job is worthless. The relevant inquiry is whether Mrs. Lumbard is physically able to perform the occupations identified by Ms. Vercillo. Dr. Abraham's report does not assist Prudential in that respect.

In addition, Dr. Abraham does not explain why he disagreed with Dr. Richmond's medical findings and his conclusion that Mrs. Lumbard is not physically able to perform any type of work. *See Calvert,* 409 F.3d at 296 (finding a reviewing physician's report to be inadequate because the reviewing physician did not explain why the conclusions of the treating physicians were rejected). The fact that Dr. Richmond had physically examined Mrs. Lumbard on numerous occasions while Dr. Abraham did nothing but a file review makes Dr. Abraham's failure to discuss the findings of Dr. Richmond all the more problematic. *See Calvert,* 409 F.3d at 295 (concluding that the plan administrator's reliance on a "pure paper' review" was "just one more factor" that supported the court's ruling that a denial of benefits

was arbitrary and capricious). It is also inexplicable that Dr. Abraham did not speak with Dr. Richmond about Mrs. Lumbard's condition.

Dr. Abraham states that if Mrs. Lumbard's "underlying degenerative changes were as significant as described, then she would be limited in her abilities to sit, stand, walk, bend, climb and carry." (Ex. 86, 00525). Dr. Abraham has no basis, however, for concluding that Mrs. Lumbard's condition is not as described by Dr. Richmond and he concedes that he has "little to offer in terms of management of [Mrs. Lumbard's] severe patellofemoral degenerative joint disease . . . ." (emphasis added). (Ex. 86, DML 00526). Thus, Dr. Abraham concedes that Mrs. Lumbard's condition is "severe" and does not dispute Dr. Richmond's assessment of Mrs. Lumbard's physical restrictions nor Mrs. Lumbard's description of her physical restrictions. That evidence shows that Mrs. Lumbard is often unable to walk more than 100 to 200 feet, cannot stand for more than 15 minutes, is unable to do stairs, ramps or climbing, and cannot sit for any length of time. Nevertheless, Dr. Abraham inexplicably concludes that Mrs. Lumbard is able to perform a "sedentary" job where the "overwhelming majority of her work activities would be done in a sitting position with limited periods of standing, walking and occasional stair climbing" and ability to lift at maximum 10 pounds. (Ex. 86, DML 00525).

Dr. Abraham's most glaring omission is his failure to consider the pain Mrs. Lumbard's suffers from as a result of her severe arthrosis. It is not credible for Dr. Abraham to claim that Mrs. Lumbard is capable of working at a sedentary job when he failed to account for her chronic and severe pain. In addition to that considerable gap in his report, Dr. Abraham does not mention the SSA's disability determination at all, even to discount it or disagree with it. Thus, Dr. Abraham's report is inadequate in a number of respects and Prudential acted arbitrarily and capriciously in relying on it to deny Mrs. Lumbard's appeal.

In sum, Prudential arbitrarily failed to follow its own appeals procedures, arbitrarily discounted

without any explanation all of the evidence that Mrs. Lumbard provided to show that she is disabled; arbitrarily rejected its own vocational consultant's conclusion about Mrs. Lumbard's lack of qualifications to be a manager; arbitrarily ignored Mrs. Lumbard's statements about how she is incapacitated by pain, her treating physician's statements and the SSA's determination that she is totally disabled and the problems identified by Mr. Violetta with Ms. Vercillo's report. Prudential's selective, result-oriented review is a disturbing illustration of arbitrary and capricious conduct by a plan administrator.

## CONCLUSION

For the foregoing reasons, the Court should deny Prudential's motion for summary judgment and allow Mrs. Lumbard's motion.

DEBORAH M. LUMBARD

By her attorneys,

/s/ James T. Finnigan
James T. Finnigan (BBO # 549620)
Rich May, a Professional Corporation
176 Federal Street
Boston, MA 02110
(617) 556-3872

Dated: November 18, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for the other parties by first class mail on November 18, 2005

/s/ James T. Finnigan
James T. Finnigan